Filed 9/16/14

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| RACEWAY FORD CASES, | E054517, E056595<br><br>(Super.Ct.No. JCCP4476)<br><br>OPINION |

APPEAL from the Superior Court of Riverside County. Dallas Holmes, Judge. (Retired judge of the Riverside Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.) Affirmed in part, reversed in part, with directions.

Rosner, Barry & Babbitt and Hallen D. Rosner, Christopher P. Barry and Angela J. Smith for Plaintiffs and Appellants Carl Stone et al.

Callahan, Thompson, Sherman & Caudill and Kellie S. Christianson for Defendant and Respondent Raceway Ford, Inc.

I. INTRODUCTION

Plaintiffs, appellants, and cross-respondents (plaintiffs) are consumers who purchased vehicles from defendant, respondent, and cross-appellant Raceway Ford (Raceway), an automobile dealership. Plaintiffs alleged numerous causes of action based

1

on laws proscribing certain acts against consumers, unfair competition, and deceptive business practices, bringing both individual claims and claims on behalf of two certified classes. The trial court, after a bench trial, entered judgment in favor of Raceway and against plaintiffs on all causes of action, except that a single plaintiff was granted rescission on a single cause of action. Separately, the trial court awarded attorneys' fees and costs to Raceway in the amount of $1,503,084.50. In these appeals, which we ordered consolidated for oral argument and decision, plaintiffs challenge the trial court's judgment on the merits (case No. E054517) and fee order (case No. E056595); Raceway has cross-appealed regarding one aspect of the trial court's fee order.

With respect to the trial court's decision on the merits (case No. E054517), plaintiffs contend that, as a matter of law, Raceway's previous practice of "backdating" second or subsequent contracts for sale of a vehicle to the original date of sale violates the Automobile Sales Finance Act, also known as the Rees-Levering Motor Vehicle Sales and Finance Act (ASFA) (Civ. Code,[1] § 2981 et seq.), the Consumer Legal Remedies Act (CLRA) (Civ. Code, § 1750 et seq.), and the Unfair Competition Law (UCL) (Bus. & Prof. Code, § 17200 et seq.). Plaintiffs ask that we reverse the trial court's judgment in favor of Raceway and against the certified class of plaintiffs who entered into backdated second or subsequent contracts with Raceway, and order entry of judgment in favor of

---

[1] Further undesignated statutory references are to the Civil Code unless otherwise indicated.

2

plaintiffs. [2] We agree that the practice of backdating could have resulted in inaccurate disclosures to class members, thereby violating the ASFA, at least in some cases. On the present record, however, we decline to order entry of judgment in favor of the plaintiff class. We instead reverse the trial court's judgment in favor of Raceway with respect to plaintiffs' backdating claims, and remand for further proceedings.

Plaintiffs also appeal the judgment in favor of Raceway with respect to the claims of a second certified class, consisting of Raceway customers who purchased used diesel vehicles from Raceway and who were charged fees for smog checks and smog certifications that were only properly applicable to purchases of gasoline vehicles. Plaintiffs argue that Raceway failed to plead and establish a valid defense to liability under the ASFA with respect to these fees, and that the class is entitled to judgment in its favor and the remedy of rescission, notwithstanding refunds paid by Raceway. We affirm the trial court's judgment with respect to plaintiffs' smog fee claims.

Additionally, plaintiffs appeal the judgment in favor of Raceway on certain individual plaintiffs' claims that Raceway violated the ASFA by failing to provide them with copies of their credit applications. Plaintiffs challenge the trial court's finding that these plaintiffs did not meet their burden of proving a violation. Plaintiffs' evidence in

_____

[2] Plaintiffs also seek review of the trial court's denial of their motion for a new trial and motion to vacate and enter different judgment pursuant to Code of Civil Procedure section 663. The trial court's denial of these posttrial motions, however, raises no substantive legal issues that are not either resolved or mooted by our ruling with respect to the trial court's judgment on the merits. We reject plaintiffs' contention, raised at oral argument, that we either must or should consider the propriety of the denial of their posttrial motions first. We therefore do not discuss these motions further.

support of these claims does not compel a decision in their favor, so we affirm the trial court's ruling.

Finally, plaintiffs appeal the judgment in favor of Raceway with respect to claims under the UCL and the CLRA brought by plaintiff Francisco Salcedo in his individual capacity. The trial court found in favor of Mr. Salcedo on his claim of fraud, and granted him the remedy of rescission, though it declined to award any punitive damages. Plaintiffs contend that the judgment in Mr. Salcedo's favor on his fraud claim—which Raceway has not appealed—establishes as a matter of law that he should also have judgment entered in his favor on his UCL and CLRA claims. We agree, and reverse, remanding the matter to the trial court for entry of judgment in favor of Mr. Salcedo on the UCL and CLRA claims he brought in his individual capacity, and for consideration as to whether he should be awarded any additional remedies, beyond those already awarded to him based on his common law fraud cause of action.

The basis for the trial court's award of fees to Raceway is in part undermined by our partial reversal of the judgment. We therefore need not and do not address the merits of the parties' arguments in the appeal and cross-appeal of the fee award, but instead vacate the trial court's fee award, and remand the issue of attorney fees and costs for reconsideration following final adjudication of the remainder of the case.

## II. FACTUAL BACKGROUND

Plaintiffs' most recent amended complaint, the second amended complaint (SAC), alleges 18 causes of action, including claims on behalf of several separate classes, and other claims on behalf of certain individual plaintiffs. The claims at issue in the present

4

appeal fall into four categories; we describe below the background facts relevant to each of these categories.

## A. Backdating Claims

For some of its customers, Raceway acts not only as seller of a vehicle, but also as creditor, by extending financing for the sale. Generally, Raceway then attempts to assign the finance contract to a commercial lender. Sometimes, after the contract for the sale and financing has been signed and the customer has taken delivery of the vehicle, Raceway has later entered into a second or subsequent contract with the customer for the same vehicle. This occurred on some occasions when commercial lenders were unwilling to accept assignment of the contract on the terms Raceway had agreed to with its customer; in that case, Raceway could contact the customer and request to renegotiate the terms of the sale and financing.[3] Alternatively, a customer could initiate a renegotiation with Raceway, for example, because he or she had regrets about the initial terms.

Plaintiffs' backdating claims arise from the circumstance that, prior to late 2004, it was Raceway's practice to date second or subsequent contracts negotiated with customers using the date of the initial contract. A customer who agreed to enter into a second or subsequent contract with Raceway would sign not only a new purchase contract, dated to the initial date of sale, but also an "Acknowledgement of Rescinded Contract" or

---

[3] Alternatively, in such circumstances, Raceway may choose to continue to act as creditor, accepting payments from the customer directly for the term of the financing, or, as will be discussed in more detail below, Raceway may choose to rescind the sale, exercising the unilateral rescission rights it holds under the terms of the contracts.

5

"Acknowledgement of Rewritten Contract," which also was backdated to the date as the original contract. The acknowledgements state that the original contract has been "'rescinded (canceled) such that no obligations shall be owed by either party under the original contract.'"

The trial court certified a class, referred to as "Class One" or the "Backdating Class" by the parties, consisting of "[a]ll persons who, since January 12, 2001, (1) purchased a vehicle from Raceway Ford, for personal use, (2) on a later date rescinded their original purchase contract, and (3) signed a subsequent or second contract for the purchase of the same vehicle, which contract was dated the date of the original purchase contract and involved financing at an annual percentage rate greater than 0.00%." There are, according to plaintiffs, approximately 1100 members of Class One.

At trial, Class One asserted claims under the ASFA, CLRA, and UCL based on the practice of backdating described above. The trial court found in favor of Raceway on all claims; its reasoning in support of this ruling will be discussed below.

**B. Smog Fee Claims**

Raceway concedes that it erroneously charged some of its customers who purchased used diesel vehicles certain fees related to performing a smog check and obtaining state smog certification that should only have been charged to purchasers of used gasoline-powered vehicles. These charges were explicitly disclosed in the contracts that the customers signed; the problem is that the fees should not have been charged at all, and neither Raceway nor the customers involved caught the error at the time of the transaction. Plaintiffs have not disputed that each of these customers has, during the

pendency of this litigation, received two checks from Raceway, the first of which refunded the fees themselves, and the second of which represented an amount Raceway calculated to represent any finance charges the customers may have incurred on the fees.

The trial court certified a class, referred to by the parties as "Class Two" or the "Smog Fee Class," consisting of "[a]ll persons except for Robert Loverso[4] who, since January 12, 2001, purchased a diesel vehicle from Raceway Ford for personal use and were charged a smog fee and a smog certification fee." There are, according to plaintiffs, 48 members of Class Two. At trial, Class Two asserted only a claim under the ASFA.[5] The trial court entered judgment in favor of Raceway, finding that Raceway's actions constituted a "bona fide error corrected with full refunds plus interest within a reasonable time under the Automobile Sales Finance Act," and holding that "Raceway is not legally required to do more to correct" its errors. Plaintiffs contend that Class Two is entitled to judgment in its favor under the ASFA and the remedy of rescission.

## C.  Credit Application Claims

Certain individual plaintiffs,[6] some of whom testified at trial, claimed that Raceway failed to provide them with copies of their credit applications, in violation of the ASFA. Raceway contended that it did provide them copies, and presented evidence

---

[4] Robert Loverso was initially a named class member but, as pleaded in the SAC, he entered into a separate settlement agreement with Raceway.

[5] Though Class Two also alleged a claim under the UCL in the SAC, the trial court only certified Class Two with respect to its claim under the ASFA.

[6] Specifically, plaintiffs Carl Stone, Deborah Stone, Francisco Salcedo, Anselmo Alaniz, Joe Contreras, Edelmira Contreras, Jonathan Ott, Martha Ott, Eldridge Johnson, Randal Kidd, Macon Pollard, Ozetta Pollard, and Suzanna Moreno.

7

at trial of its policy and practice to give every customer a copy of any credit application submitted by a customer. The trial court ruled in favor of Raceway, finding plaintiffs had not met their burden of proof, and noting there was "competent but conflicting evidence presented on both sides" as to whether plaintiffs were provided copies of their credit applications in conjunction with their initial contracts with Raceway, and "no credit applications were needed or required" with respect to any second or subsequent contracts.

## D. Individual Claims of Francisco Salcedo

Plaintiff Francisco Salcedo is a Raceway customer who initially purchased and took delivery of a new pickup truck, a 2004 Ford. He testified that a representative of Raceway subsequently called him and told him that he needed to bring the vehicle back, because he did not qualify for financing. Mr. Salcedo returned the vehicle to the dealership. When he did so, he asked if he could get back his trade-in; he was told that he could not. He was told that instead he had to choose an alternative vehicle from several presented by Raceway that he would be qualified to purchase; he selected a used 2001 Chevrolet pickup truck, signing a new purchase contract for the second vehicle.

Raceway was acting within its contractual rights to require Mr. Salcedo to return the 2004 Ford. Under the terms of its contracts, Raceway holds a unilateral right of rescission for a period of 10 days after a sale, which may be exercised if Raceway is unable to verify a customer's credit and assign the contract.[7] Under the terms of its

---

[7] A buyer signing a Raceway contract agrees "that it may take a few days for [Raceway] to verify your credit and assign the contract," and agrees that "if [Raceway] is unable to assign the contract to any one of the financial institutions with whom

*[footnote continued on next page]*

8

contractual rescission rights, however, once Raceway elects to rescind a contract and receives the vehicle from the customer, Raceway must return "all consideration received by [Raceway], including any trade-in vehicle." That is not what Raceway did in the case of Mr. Salcedo.

The trial court ruled that Mr. Salcedo had satisfied his burden of proof for his fraud claim, finding him to be "a credible witness when he testified that he was told by Raceway's authorized representative upon his return after the customary telephone call that he could not refuse to sign a second contract and unwind the transaction because they could not return his trade-in since they didn't know where it was." Raceway has not challenged this ruling on appeal.

The trial court's statement of decision does not specifically address two other claims asserted by Mr. Salcedo in his individual capacity,[8] based on the same facts, namely, claims under the UCL and the CLRA. The trial court's judgment, entered on October 12, 2011, provides no elucidation, because it does no more than adopt and attach the statement of decision. Similarly, in considering the issue of attorney fees, the trial court explicitly reduced the award in favor of Raceway by an amount intended to reflect

---

*[footnote continued from previous page]*

[Raceway] regularly does business under an assignment acceptable to [Raceway], [Raceway] may rescind (cancel) the contract."

[8] Mr. Salcedo is also a named representative of Class One. After Mr. Salcedo's initial contract for the 2001 Chevrolet, he was later invited back to enter into a replacement contract with respect to that same vehicle, on terms that would lower his monthly payment. Both Mr. Salcedo's initial contract for the 2001 Chevrolet (his second contract with Raceway) and his subsequent contract for the same vehicle (his third contract with Raceway) are dated June 11, 2004.

9

Raceway's unsuccessful defense of Mr. Salcedo's fraud claim, but makes no mention of Mr. Salcedo's individual UCL or CLRA claims. Mr. Salcedo is not among the individual plaintiffs held jointly and severally liable for the fees awarded to Raceway as prevailing party, even though he was a named member of Class One, in addition to asserting individual claims.

Nevertheless, the parties and the trial court all appear to have understood the trial court to have rendered a decision in favor of Raceway on all claims asserted by plaintiffs at trial, with the sole exception of Mr. Salcedo's fraud claim. We therefore will proceed with our analysis of the case on the understanding that the court intended to enter judgment in favor of Raceway and against Mr. Salcedo on his UCL and CLRA claims. (See *In re Marriage of Richardson* (2002) 102 Cal.App.4th 941, 949 ["'Where an ambiguity exists, the court may examine the entire record to determine the judgment's scope and effect.'"].)

### III. PROCEDURAL BACKGROUND

Plaintiffs' initial complaint in this matter was filed on October 29, 2004. The SAC was filed on July 21, 2008. A bench trial on claims remaining in the case was held in from March 3, 2010, through March 9, 2010.

The posttrial procedural history of this case is an object lesson on the importance of California Rules of Court, rule 3.1590(*l*), which provides the time within which, if a written judgment is required after a court trial, the trial court must sign and file the

judgment.[9]  Also, even though many of the details are not strictly relevant to our disposition of these appeals, the posttrial procedural history is useful for understanding the current posture of the case.  We will, therefore, describe it at some length.

On March 30, 2010, the trial court issued its tentative decision on the merits.  On April 16, 2010, the trial court issued a statement of decision, identical in substance to the tentative decision, and finding in favor of Raceway on all causes of action except that a single plaintiff—Mr. Salcedo—was granted rescission on a single cause of action.  On April 29, 2010, Raceway filed a request for entry of judgment, including a proposed judgment.  On May 3, 2010, and May 5, 2010, plaintiffs filed objections to the request for entry of judgment and statement of decision, respectively, and requested a hearing under California Rules of Court, rule 3.1590(k).  On May 13, 2010, the trial court issued a minute order denying the requested hearing, overruling the objections, and ordering that the statement of decision would stand as the decision of the court.  No judgment, however, was signed and entered by the court.

On June 9, 2010, Raceway filed a second request for entry of judgment, including a revised proposed judgment.  On June 15, 2010, the trial court denied plaintiffs' motion for leave to file a third amended complaint to conform to proof adduced at trial.  The trial court also denied an oral request by plaintiffs for a stay of proceedings until after the

---

[9]  California Rules of Court, rule 3.1590(*l*) provides that where a written judgment is required, "the court must sign and file the judgment within 50 days after the announcement or service of the tentative decision, whichever is later, or, if a hearing was held under [rule 3.1590(k)], within 10 days after the hearing."

11

Fourth District, Division One Court of Appeal issued a ruling on a similar action. The trial court directed counsel to submit a joint proposed judgment to the court.

The parties did not submit a joint proposed judgment prior to the issuance of *Nelson v. Pearson Ford Co.* (2010) 186 Cal.App.4th 983 (*Nelson*) by the Fourth District, Division One Court of Appeal on July 15, 2010. In *Nelson*, as in this case, plaintiffs asserted (among other things) class claims based on backdating of second or subsequent vehicle contracts by a dealership, allegedly in violation of the ASFA, UCL, and CLRA. (*Nelson*, *supra*, at p. 994.) The *Nelson* court reached a decision contrary to that rendered by the trial court in its statement of decision in this action, finding the dealership's backdated contracts violated the ASFA, UCL, and CLRA. (*Nelson*, at pp. 1005, 1014, 1023.) The *Nelson* court's decision, and the reasoning underlying it, will be discussed at length below.

On July 29, 2010, Raceway filed a third request for entry of judgment, including a newly revised proposed judgment. Plaintiffs opposed the entry of judgment based upon the *Nelson* ruling. On September 29, 2010, the trial court continued the hearing on the motion for entry of judgment for 45 days to allow the Supreme Court to rule on the possible depublication of *Nelson*. On December 10, 2010, the trial court determined that it had no choice but to follow the binding precedent of an appellate court and ordered its previous statement of decision withdrawn, stated that it was now finding for the plaintiffs under *Nelson*, and set a hearing for January 28, 2011, to determine the proper remedy.

Raceway filed a petition for writ of mandate in this court on December 23, 2010, arguing that the trial court should be required to enter judgment in conformity with its

12

April 16, 2010, statement of decision. We agreed, and on March 22, 2011, in an unpublished opinion, we ordered that a peremptory writ of mandate issue, directing the trial court to vacate the December 10, 2010, order that vacated its April 16, 2010, statement of decision, and to enter a judgment nunc pro tunc to June 10, 2010, in conformity with the April 16, 2010, statement of decision. (*Raceway Ford, Inc. v. Superior Court* (Mar. 22, 2011, E052543)[nonpub.opn.].)

On June 27, 2011, the trial court issued a minute order vacating its December 10, 2010, order and stating that it was entering judgment nunc pro tunc to June 10, 2010, in conformity with its April 16, 2010, statement of decision. Despite this minute order announcing judgment, however, no judgment was signed and filed by the trial court.

On July 13, 2011, plaintiffs filed a motion for new trial and a motion to vacate and enter a different judgment, treating the trial court's June 27, 2011, minute order as a judgment. On August 19, 2011, the trial court issued a minute order denying the motions.

On September 7, 2011, plaintiffs filed the notice of appeal for case No. E054517, purporting to appeal from the June 27, 2011, minute order, as well as the denial of their motion for new trial and motion to vacate and enter a new judgment. On October 6, 2011, this court issued an order directing plaintiffs to file the signed judgment in support of their Notice of Appeal. They were unable to do so immediately, because the trial court had never signed and entered a judgment. The trial court entered a signed judgment on October 12, 2011, after an *ex parte* application on that date by appellants, requesting that it do so. Plaintiffs submitted the signed judgment to this court on October 14, 2011, and

13

on October 26, 2011, we issued an order construing plaintiffs' appeal to have been taken from the signed judgment entered by the trial court on October 12, 2011.

On June 8, 2012, the trial court filed an order granting fees and costs to Raceway (fee order). Plaintiffs appealed the fee order (case No. E056595). On July 5, 2012, we ordered that case No. E054517 and case No. E056595 be consolidated for oral argument and decision. On July 9, 2012, Raceway filed its cross-appeal of the fee order in case No. E056595.

## IV.  DISCUSSION

### A.  Standard of Review

"The most fundamental rule of appellate review is that a judgment is presumed correct, all intendments and presumptions are indulged in its favor, and ambiguities are resolved in favor of affirmance. [Citations]" (*City of Santa Maria v. Adam* (2012) 211 Cal.App.4th 266, 286 (*City of Santa Maria*).)

"'In general, in reviewing a judgment based upon a statement of decision following a bench trial, "any conflict in the evidence or reasonable inferences to be drawn from the facts will be resolved in support of the determination of the trial court decision. [Citations.]" [Citation.] In a substantial evidence challenge to a judgment, the appellate court will "consider all of the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference, and resolving conflicts in support of the [findings]. [Citations.]" [Citation.] We may not reweigh the evidence and are bound by the trial court's credibility determinations. [Citations.] Moreover, findings of fact are liberally construed to support the judgment. [Citation.]'"

14

(*Cuiellette v. City of Los Angeles* (2011) 194 Cal.App.4th 757, 765 (*Cuiellette*), quoting *Estate of Young* (2008) 160 Cal.App.4th 62, 75-76.)  When a party challenges on appeal a ruling that it failed to carry a burden of proof, the substantial evidence standard is inappropriate, and "'the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law.  [Citations.]'"  (*Sonic Manufacturing Technologies, Inc. v. AAE Systems, Inc.* (2011) 196 Cal.App.4th 456, 465-466 (*Sonic*).)

"'Questions of statutory interpretation, and the applicability of a statutory standard to undisputed facts, present questions of law, which we review de novo.  [Citation.]'" (*Cuiellette*, *supra*, 194 Cal.App.4th at p. 765, quoting *Jenkins v. County of Riverside* (2006) 138 Cal.App.4th 593, 604.)

**B.  Backdating Claims**

Plaintiffs contend that Raceway's previous practice of backdating second or subsequent contracts to the date of the original sale violates the ASFA by:  (1) causing the annual percentage rate (APR) disclosed in second or subsequent contracts to be inaccurate; (2) purporting to require customers to pay an "illegal finance charge" for the period prior to the consummation of their second or subsequent contracts; and (3) violating the "single document" rule (§ 2981.9) and the itemized disclosure requirements of the ASFA (§ 2982, subd. (a)).  They argue that Class One is entitled, as a matter of law, to the remedy of rescission for Raceway's violations of the ASFA. Plaintiffs further contend that the backdating also violated the UCL and the CLRA, and that they are entitled to judgment in their favor on those claims as well.

15

For the reasons stated below, we reverse the trial court's judgment in favor of Raceway on the backdating claims, but decline to order that judgment be entered in favor of plaintiffs, instead remanding for further proceedings.

*1. Claims Under the ASFA*

"Broadly speaking, [the ASFA] is a consumer protection law governing the sale of cars in which the buyer finances some, or all, of the car's purchase. [Citations.]" (*Rojas v. Platinum Auto Group, Inc.* (2013) 212 Cal.App.4th 997, 1002.) The ASFA was enacted "to increase protection for the unsophisticated motor vehicle consumer and provide additional incentives to dealers to comply with the law. [Citations.]" (*Nelson*, *supra*, 186 Cal.App.4th at p. 999.)

The ASFA requires that a car dealer make certain disclosures to a buyer who finances some or all of a car's purchase, including the specific disclosures enumerated in section 2982, subdivision (a). In addition, the first, unlettered paragraph of section 2982 requires that the car dealer also make all disclosures required by the federal Regulation Z (12 C.F.R. § 226.1 et seq. (2014)), whether or not Regulation Z applies to the transaction.[10] (§ 2982.) Among the items that a lender must disclose under TILA and Regulation Z that are not specifically enumerated in section 2982, subdivision (a), is the APR of the loan. (15 U.S.C. § 1638(a)(4); 12 C.F.R. § 226.18(e) (2014).) Regulation Z defines APR as "a measure of the cost of credit, expressed as a yearly rate," and provides the methods by which the APR may be calculated. (12 C.F.R. § 226.22(a)(1) (2014); 12

---

[10] Regulation Z is a regulation issued by the Federal Reserve Board to implement the Truth In Lending Act (TILA, 15 U.S.C. § 1601 et seq.). (See Civ. Code, § 2981(m).)

16

C.F.R. § 226, appen. J. (2014).) "'APR' . . . differs from the general definition of interest rate because it considers, by definition, a broader range of finance charges when determining the total cost of credit as a yearly rate." (*Smith v. Anderson* (4th Cir. 1986) 801 F.2d 661, 663.)

In a closed-end credit transaction[11] such as the car loans at issue in this case, the APR is a function of the finance charge, the amount financed, and the term of the transaction. (See generally 12 C.F.R. § 226, appen. J. (2014).) Calculating the APR of a transaction using an earlier date as the beginning of the term yields a lower APR than a later date, assuming none of the other variables, including the end of the term, is changed. (See, e.g., *Nelson*, *supra*, 186 Cal.App.4th at p. 1001 [calculating APR of transaction at issue using October 2 as beginning of term yielded result of 21 percent; using October 8 yielded result of 21.23 percent].)

Regulation Z provides that "[t]he term of the transaction begins on the date of its consummation, except that if the finance charge or any portion of it is earned beginning

---

[11] TILA and Regulation Z impose different disclosure requirements depending on whether the loan at issue is an "open-end credit" transaction or a "closed-end credit" transaction. Open-end credit includes "credit-card credit and revolving credit more broadly." (*Benion v. Bank One, Dayton, N.A.* (7th Cir. 1998) 144 F.3d 1056, 1057; see 12 C.F.R. § 226.2(a)(20) (2014).) Closed-end credit, by contrast, "means consumer credit other than 'open-end credit.'" (12 C.F.R. § 226.2(a)(10) (2014); see also *McAnaney v. Astoria Fin. Corp.* (E.D.N.Y. Sept. 12, 2007) No. 04-CV-1101, 2007 U.S. Dist. LEXIS 67552, *20 ["A 'closed-end credit' transaction is one where 'the finance charge is divided into the term of the loan and incorporated into time payments,' and includes a completed loan like a mortgage or a car loan. [Citations.]"].)

on a later date, the term begins on the later date."[12]  (12 C.F.R. § 226, appen. J(b)(2) (2014).)  Consummation is defined as "the time that a consumer becomes contractually obligated on a credit transaction."  (12 C.F.R. § 226.2(a)(13) (2014).)  When a consumer "becomes contractually obligated on a credit transaction" (*ibid*.) is determined, in turn, by state law.  (Official staff interpretations, 12 C.F.R. § 226, supp. I, subpt. A(2)(a)(13)(1) (2014)  ["*State law governs*.  When a contractual obligation on the consumer's part is created is a matter to be determined under applicable law; Regulation Z does not make this determination. . . ."].)

In California, a vehicle sale is "deemed completed and consummated when the purchaser of the vehicle has paid the purchase price, or, in lieu thereof, has signed a purchase contract or security agreement, and has taken physical possession or delivery of the vehicle."  (Veh. Code, § 5901, subd. (d).)  Importantly, however, it is not the consumer's obligation to the *sale* of the vehicle that is relevant to determining the term of a credit transaction under Regulation Z.  As noted, "consummation" in the meaning of Regulation Z refers to when the consumer becomes "contractually obligated *on a credit transaction*" (12 C.F.R. § 226.2(a)(13), italics added).)—that is, when the consumer "becomes legally obligated to accept *a particular credit arrangement*."  (Official staff interpretations, 12 C.F.R. § 226, supp. I, subpt. A(2)(a)(13)(2) (2014), italics added.)  A

---

[12] A previous version of Regulation Z permitted the APR to be calculated using a term of the transaction beginning on any date when a finance charge begins to accrue under the terms of a credit agreement, implicitly including dates prior to consummation. (12 C.F.R. § 226.40(b)(2) (1982) ["The term of the transaction begins on the date of its consummation, except that if the finance charge or any portion of it is earned beginning on some other date, the term begins on that other date. . . ."].)

consumer's contractual obligation to the *sale* may or may not coincide exactly with his obligation to a particular credit arrangement, and the two obligations are analytically separate under Regulation Z, no matter whether they coincide or not. (Official staff interpretations, 12 C.F.R. § 226, supp. I, subpt. A(2)(a)(13)(2) (2014); see also, e.g., *Bragg v. Bill Heard Chevrolet, Inc.* (11th Cir. 2004) 374 F.3d 1060, 1066 [consummation occurs not when title passes or when bilateral contract is formed, but rather when consumer becomes obligated on the credit agreement].)

Federal authority applying Regulation Z supports the proposition that, where a consumer enters into a second contract with a dealership relating to a vehicle sale, the date of "consummation" of the credit transaction associated with the second contract is generally the date of the second contract. In *Gibson v. LTD, Inc.* (4th Cir. 2006) 434 F.3d 275, for example, the Fourth Circuit considered a second contract for sale of the same vehicle, entered into one week after the first, after financing could not be obtained under the original terms. (*Id.* at p. 286.) Noting that the second contract contemplated an increased down payment, and therefore a changed finance charge, the court found the second contract "consummated a new finance arrangement," requiring new disclosures to be made under Regulation Z before its consummation. (*Gibson*, *supra*, at p. 286.) Similarly, in *Janikowski v. Lynch Ford, Inc.* (7th Cir. 2000) 210 F.3d 765 (*Janikowski*), the Seventh Circuit analyzed two contracts between an automobile dealership and a consumer regarding the same vehicle, entered into one day apart, after financing could not be approved on the original terms. (*Id.* at p. 767 & fn. 3.) The *Janikowski* court treated the two contracts as separate legal obligations, noting that the consumer was

19

under no obligation to purchase the vehicle on credit terms other than those described in the first contract until the second contract was signed. (*Id.* at 767, fn. 3.)

Thus, the trial court erred when it looked to Vehicle Code section 5901, and concluded that "[a] rewritten contract does not generate a new consummation date under either federal or state law, . . ." commenting that "no statute or case tells us that [the original] consummation does not continue in effect while the buyer keeps the car and the contract is rewritten . . . ." This reasoning inappropriately muddles together consummation of the sale with consummation of the credit transaction. (See Official staff interpretations, 12 C.F.R. § 226, supp. I, subpt. A(2)(a)(13)(2) (2014).) There is no question that, when customers in Class One first signed a contract with Raceway and took delivery of their vehicles, a sale was consummated in the meaning of Vehicle Code section 5901. And the customers also then became legally committed to a particular credit transaction. They did not become legally obligated to the terms of the credit transaction embodied in their *second or subsequent* contract with Raceway, however, until that second or subsequent contract was signed. (See, e.g., *Janikowski*, *supra*, 210 F.3d at p. 767 & fn. 3.) Thus, the date the second or subsequent contract was signed would normally be the appropriate date to use as the beginning of the term for purposes of calculating the APR of the second or subsequent contract's credit transaction, under the method required by Regulation Z. That was not Raceway's practice: instead, the APR of a second or subsequent contract would be calculated using the same dates as the initial contract.

Nevertheless, judgment in favor of plaintiffs is not necessarily appropriate in all cases of backdating by Raceway. Regulation Z contemplates certain circumstances where a second or subsequent contract between a buyer and a seller does not trigger any requirement for further disclosures, including with respect to APR. As a general rule, where "an existing obligation" subject to Regulation Z "is satisfied and replaced by a new obligation undertaken by the same consumer," it is considered to be a "refinancing."[13] (12 C.F.R. § 226.20(a) (2014).) "A refinancing is a new transaction requiring new disclosures to the consumer." (*Ibid.*; see also official staff interpretations, 12 C.F.R. § 226, supp. I, subpt. C(20)(a) (2014) ["A refinancing is a new transaction requiring a complete new set of disclosures."].) This general rule, however, is subject to five explicit exceptions, wherein an existing obligation is replaced by a new obligation undertaken by the same consumer, but the transaction nevertheless "shall not be treated as a refinancing." (12 C.F.R. § 226.20(a)(1)-(5).) At least one of these exceptions is potentially relevant in this case: "A reduction in the annual percentage rate with a corresponding change in the payment schedule." (12 C.F.R. § 226.20, subd. (a)(2).) The official staff interpretations of Regulation Z explain that "[a] corresponding change in the payment schedule to implement a lower annual percentage rate would be a shortening of

---

[13] Raceway spills a substantial amount of ink arguing that the backdated second and subsequent contracts should be considered "lawful novations" under California law. The matter at issue, however, is not whether it was "lawful" for the parties to enter into the second or subsequent contracts, or even how best generally to characterize those new contracts under California law. Rather, it is whether the disclosures that were included in the second and subsequent contracts complied with the requirements of the Regulation Z, as incorporated into the ASFA. California law on "novations" is simply not pertinent to that issue.

the maturity, or a reduction in the payment amount or the number of payments of an obligation." (Official staff interpretations, 12 C.F.R. § 226, supp. I, subpt. C(20)(a)(2) (2014); see also *Krenisky v. Rollins Protective Services Co.* (2d Cir. 1984) 728 F.2d 64, 66-67 (*Krenisky*) ["The protections extended to consumers against creditor overreaching are not compromised by non-disclosure of unilateral *reductions* in credit terms."].) Thus, a second or subsequent contract entered into between Raceway and a customer regarding the same vehicle would generally be considered a "refinancing," triggering a requirement for new disclosures. But if the second contract is identical to the first, except that the APR is reduced with a corresponding change in the payment schedule, there would be no "refinancing" in the meaning of Regulation Z, and no new disclosures would be required at all with respect to the terms of the new contract.

In addition, Regulation Z allows for a small margin of error with respect to calculation of the APR. A disclosed APR is "considered accurate" under Regulation Z if it is "not more than 1/8 of 1 percentage point above or below" the rate determined utilizing the authorized methods. (12 C.F.R. § 226.22(a)(2) (2014).) Thus, a second or subsequent contract that is backdated only a short period of time could conceivably fall within the margin of error allowed by Regulation Z, even though the disclosed APR was calculated using a date earlier than the date the contract was signed. Several of the

22

allegedly backdated contracts introduced into the record below were apparently backdated by no more than one day.[14]

Moreover, we disagree with plaintiffs' assertion that backdating imposed an "illegal finance charge" on consumers, even with respect to the second or subsequent contracts that are refinancings, and which fall outside of the margin of error allowed by Regulation Z. Plaintiffs' notion, adopted from *Nelson*, is that any finance charge accruing with respect to a second or subsequent contract prior to the consummation date of that contract constitutes an "illegal finance charge" in the form of "preconsummation interest." (See *Nelson*, *supra*, 186 Cal.App.4th at p. 1003.) While we typically follow the decisions of other appellate districts or divisions, those decisions are not binding on us, and we follow them only if we lack good reason to disagree. (*People v. Gipson* (2013) 213 Cal.App.4th 1523, 1529.) As discussed below, we find good reason to disagree with *Nelson*'s analysis, and decline to follow it in some respects.

The purpose of Regulation Z is to "promote the informed use of consumer credit by requiring disclosures about its terms and cost." (12 C.F.R. § 226.1(b) (2014).) Nevertheless, with exceptions not relevant here, Regulation Z "does not generally govern charges for consumer credit." (12 C.F.R. § 226.1(b) (2014).) More specifically, nothing in Regulation Z forbids interest on consumer credit contracts to be calculated as accruing

---

**14** Indeed, it may be that *none* of the class members can show that the disclosed APR differed materially from the APR as determined utilizing the authorized methods. We acknowledge Raceway's contention at oral argument to that effect, but we cannot decide that issue on the present record as a matter of law. Rather, it is a question of fact that should be decided by the trial court in the first instance.

from a date prior to consummation of the contract, if the parties agree among themselves to such a calculation.  As noted above, the current version of Regulation Z requires that the "term of the transaction" used *for purposes of calculating and disclosing APR* must be no earlier than the date of consummation.  (See 12 C.F.R. § 226, appen. J(b)(2) (2014).)  It does not follow from this requirement regarding how the APR must be calculated and disclosed to the consumer that there is any substantive limitation on the date from which interest may be calculated in the contract generally, such that "preconsummation interest" is an "illegal finance charge," as *Nelson* would have it.  (See *Nelson*, *supra*, 186 Cal.App.4th at p. 1003.)

In concluding otherwise, *Nelson* stretches an already thin thread of authority beyond the breaking point.  *Nelson* cites *Krenisky*, *supra*, 728 F.2d at p. 67, fn. 3, and *Rucker v. Sheehy Alexandria, Inc.* (E.D. Va. 2002) 228 F.Supp.2d 711, 717 (*Rucker I*) for the proposition that "[s]everal courts have decided that accrual dates prior to the date of consummation are prohibited."  (*Nelson*, *supra*, 186 Cal.App.4th at p. 998.)  We will set aside the circumstance that the footnote in *Krenisky* is dictum from a Second Circuit Court of Appeals opinion issued thirty years ago, and that this dictum had been followed in that time period precisely twice before *Nelson*, once in *Rucker I*, and again by the same federal district court in Virginia, as part of the same case.  (*See Rucker I*, *supra*, at p. 717; *Rucker v. Sheehy Alexandria, Inc.* (E.D. Va. 2003) 244 F.Supp.2d 618, 623 (*Rucker II* or,

24

collectively with *Rucker I*, *Rucker*).**15**)  Even these cases cited in *Nelson* do not support the conclusion that "preconsummation interest" is an "illegal finance charge."  (*Nelson*, *supra*, at p. 1003.)  The cited footnote in *Krenisky* discusses the term "accrual date" as "employed for the purpose of calculating the annual percentage rate," not as employed for any purpose related to a finance charge.  (*Krenisky*, *supra*, 728 F.2d at p. 67, fn. 3.)  Similarly, in *Rucker I*, the court explicitly acknowledges that "[s]ophisticated parties can choose monthly payment rates and schedules which reflect the imposition of an agreed upon retroactive interest rate, provided the *disclosed* APR is calculated according to the regulations."  (*Rucker I*, *supra*, at p. 718, fn. 10.)  Indeed, the *Rucker* court rejects the plaintiff's request for actual damages as measured by the amount of preconsummation interest, reasoning that, among other things, "[a]lthough the APR was not properly calculated and disclosed, [plaintiff] has not shown that the amount or timing of her payments itself violated TILA or was otherwise illegal."  (*Rucker I*, *supra*, at p. 720, fn. 16.)

In *Rucker II*, the district court makes the point that preconsummation interest is not itself illegal or improper just as directly as in *Rucker I*.  The court notes that *Krenisky* "held that Regulation Z precludes the use of an earlier effective date *when calculating an APR*," (*Rucker II*, *supra*, 244 F.Supp.2d at p. 623, italics added), but "TILA and Regulation Z do not set limits on what *effective* terms the parties may agree to; they merely dictate the manner in which the terms of the credit transaction must be *disclosed*."

---

**15**  *Rucker II* is an order denying a motion to reconsider the memorandum opinion that is *Rucker I*.

25

(*Id.* at pp. 625-626). Thus, in the *Rucker* case, the parties "could have agreed to a payment schedule which reflects the retroactive imposition of the agreed upon . . . rate starting on April 3 [the date to which the contract at issue was backdated]; all that TILA requires is that the *disclosed* APR on the [contract] be calculated pursuant to the consummation date of April 13, not the agreed upon effective date of April 3." (*Id.* at pp. 625-626.)

In addition, at least one court has explicitly rejected the notion, which underpins *Nelson*'s analysis, that a backdated contract results in liability "preconsummation." In *Nigh v. Koons Buick Pontiac GMC, Inc.* (*Nigh*) the Fourth Circuit considered the argument that, with respect to a contract entered into on March 5, but backdated to February 25, disclosures made on March 5 were untimely. (*Nigh v. Koons Buick Pontiac GMC, Inc.* (4th Cir. 2003) 319 F.3d 119, 129, revd. on other grounds *sub nom. Koons Buick Pontiac GMC, Inc. v. Nigh* (2004) 543 U.S. 50.) The *Nigh* court rejected the argument, remarking that, "though superficially clever, [it] is without merit." (*Nigh*, *supra*, at p. 129.) Though the plaintiff "was liable for monies *calculated* from February 25 on, he did not *become liable* for, those monies until March 5, by which point he had received the material disclosures." (*Ibid.*) Here, similarly, plaintiffs' backdated contracts did not cause them to pay a finance charge when no contract existed, as *Nelson* would have it. (Cf. *Nelson*, *supra*, 186 Cal.App.4th at p. 1003.) Plaintiffs only became liable for finance charges pursuant to their second or subsequent contract with Raceway once those contracts were signed, even if their payments were calculated using a starting date prior to consummation.

26

We conclude that *Nelson* misreads *Krenisky* and *Rucker*, as well as TILA and Regulation Z, when it declares "preconsummation interest to be an illegal finance charge." (See *Nelson*, *supra*, 186 Cal.App.4th at p. 1003.)

In sum, the trial court erred by ruling categorically in favor of Raceway with respect to the claims of the backdating class under the ASFA. The date the second or subsequent contracts of the members of the backdating class were "consummated"—as that term is used in Regulation Z and incorporated into the ASFA, and insofar as it relates to the financial arrangement embodied therein (as opposed to the sale of the vehicle)—is the date those contracts were signed. New disclosures may have been required with respect to those second or subsequent contracts, if they constituted a refinancing in the meaning of Regulation Z. And since the disclosed APR in the second or subsequent contracts was calculated using a different date as the beginning of the term—namely, the date of the corresponding initial contract—the disclosures *may* have fallen outside the margin of error allowed by Regulation Z, and thereby violated the ASFA. As such, the trial court's judgment in Raceway's favor on plaintiffs' ASFA claims based on backdating must be reversed.

Nevertheless, we will not order that judgment be entered instead in favor of Class One, as plaintiffs have requested. We reject plaintiffs' contention that any interest calculated from prior to the actual date of signing of the backdated contracts constitutes an illegal finance charge. The only potential violation shown by plaintiffs is an inaccurately calculated APR, which would violate Regulation Z and, by virtue of Regulation Z's incorporation by reference into the unlettered first paragraph of section

27

2982, would violate the ASFA. But although the disclosed APR on second or subsequent contracts of some class members may have fallen outside the margin of error allowed by Regulation Z, that may not be so for all class members. It is also possible that the only change between some class members' initial contract and their second or subsequent contract was a lowering of the APR. Such a second or subsequent contract would not be a "refinancing" in the meaning of Regulation Z, and no additional disclosures beyond those relating to the first contract would be required. We therefore remand to the trial court to determine in the first instance how best to adjudicate the case given the potentially differing circumstances of the various members of the backdating class, as it is currently defined,[16] and to conduct any necessary further proceedings.

2. *Remedies for Violation of ASFA*

Assuming that at least some members of the backdating class can show that their backdated second or subsequent contract with Raceway is a refinancing in the meaning of Regulation Z, and the APR disclosed in that contract fell outside of the margin of error allowed by Regulation Z, the trial court will have to determine what remedy, if any, is appropriate under the ASFA. Plaintiffs have argued that the damages should be awarded in accordance with *Nelson* by treating the contracts as unenforceable and ordering the remedies of rescission and restitution. We disagree with *Nelson*'s analysis, and decline to follow it.

---

[16] Among other things, the trial court will have to determine whether class resolution of plaintiffs' backdating claims remains appropriate, and if so what measures—perhaps redefinition of the class, or formation of subclasses, for example— may be needed to facilitate adjudication of the claims.

The Legislature added the reference to Regulation Z to section 2982 in 1981, simultaneously amending sections 2983 and 2983.1 regarding the enforceability of contracts governed by the ASFA.  (Stats. 1981, ch. 1075, p. 4125, § 14, operative Oct. 1, 1982; Stats. 1981, ch. 1075, pp. 4132-4133, §§ 18, 19, operative Oct. 1, 1982.)  It did not specify, however, that a failure to comply with Regulation Z would also render the contract unenforceable.  Under section 2983, only violations of section 2981.9, or subdivisions (a), (j), or (k) of section 2982 make the contract unenforceable: there is no mention of the incorporation of Regulation Z in the first, unlettered paragraph of section 2982.  (§ 2983; see also § 2982.)  As *Nelson* correctly notes, "[t]he language of these statutes is clear that only the violation of *specific* disclosure requirements renders the contract unenforceable."  (*Nelson*, *supra*, 186 Cal.App.4th at p. 1001.)

As noted, *Nelson* finds backdated contracts between a dealership and buyer to violate section 2981.9 and subdivision (a) of section 2982, thereby rendering the contracts unenforceable under section 2983.  (*Nelson*, *supra*, 186 Cal.App.4th at p. 1002.) Here we part ways with the analysis of our sister court:  we find neither subdivision (a) of section 2982 nor section 2981.9 applicable.[17]

First, subdivision (a) of section 2982:  This subdivision lists various specific disclosures that must be included in a contract subject to the ASFA and labeled

---

[17] Subdivisions (j) and (k) are the other provisions of section 2982, violation of which would render a contract unenforceable under section 2983.  *Nelson* explicitly finds subdivision (j) not to apply to the dealership's backdated contracts.  (*Nelson*, *supra*, 186 Cal.App.4th at p. 1005.)  No party in *Nelson*, or here, has argued that subdivision (k) could apply.  We agree with *Nelson* regarding subdivision (j), and plaintiffs have not argued that we should do otherwise.

"itemization of the amount financed."  (§ 2982, subd. (a).)  APR is not one of the items included in subdivision (a); as noted, the requirement to disclose APR is included in the ASFA by means of the reference to Regulation Z in the unlettered first paragraph of section 2982.  The natural conclusion, therefore, is that subdivision (a) of section 2982 is inapplicable to the alleged defect in Raceway's backdated contracts, namely, inaccurate disclosure of APR.

In reaching a contrary conclusion, *Nelson* relies on the notion, which we rejected above, that any interest accruing from before the consummation date of the contract is an "illegal charge."  (*Nelson*, *supra*, 186 Cal.App.4th at p. 1002.)  In addition, *Nelson* cites *Thompson v. 10,000 RV Sales, Inc.* (2005) 130 Cal.App.4th 950 (*Thompson*) as authority for the proposition that, even though "preconsummation interest is not listed as a required disclosure" in section 2982, subdivision (a), the failure to separately disclose that amount nevertheless violates that subdivision.  (*Nelson*, *supra*, at p. 1002.)  We disagree, however, that *Thompson* is fairly read to support that proposition.

In *Thompson*, the court considered the effect of a dealership's inclusion of "over-allowances" on trade-in vehicles.  (*Thompson*, *supra*, 130 Cal.App.4th at p. 963.)  "Over-allowance" refers to the difference between the trade-in vehicle's value as stated in the contract and the dealer's evaluation of the vehicle's value.  (*Id.* at p. 980.)  In *Thompson*, the dealer used over-allowances to "manipulate numbers" to increase the likelihood the buyer would be approved for financing by third-party lenders evaluating the transaction.  (*Id.* at pp. 973, 977, 979-980 & fn. 21.)  The *Thompson* court reaches the unsurprising conclusion that the use of "phantom" numbers to make a buyer appear creditworthy,

30

thereby defrauding not only lenders, but also buyers (who end up paying increased sales tax and license fees on inflated cash price amounts, and who also become obligated to pay for loans they may not otherwise have qualified for and may not be able to afford) violates the ASFA and constitutes an unfair business practice. (*Thompson*, *supra*, at pp. 961, 978-979.)

The "over-allowances" at issue in *Thompson* are distinguishable, however, from the inaccurately disclosed APRs at issue in *Nelson* and (potentially) the case at bar. The over-allowances in *Thompson* rendered false *other* information disclosed the contracts, including the cash price of the vehicle being purchased, the value of the traded in vehicle, and the total downpayment—disclosures explicitly required by subdivision (a) of section 2982. (*Thompson*, *supra*, 130 Cal.App.4th at p. 979 [noting that including over-allowances resulted in inaccurate disclosures]; see § 2982, subds. (a)(1)(A), (a)(6)(C), and (a)(6)(G).) In contrast, an APR calculated improperly in a backdated contract does not result in the propagation of inaccurate numbers throughout the rest of the contract. The APR is not used in deriving any information to be disclosed pursuant to subdivision (a) of section 2982. In other words, Raceway's backdated contracts not only contain all the disclosures required by subdivision (a) of section 2982, those disclosures are accurate in all respects. If anything in the contracts' disclosures is inaccurate, it is the APR, and, as noted, APR is not one of the required disclosures listed in subdivision (a) of section 2982. We conclude, therefore, that the backdated Raceway contracts are not rendered unenforceable because of any violation of that subdivision.

31

Turning now to section 2981.9: This section of the ASFA contains, among other things, the "single document rule," requiring that "all of the agreements of the buyer and seller with respect to the total cost and the terms of payment for the motor vehicle" be contained "in a single document." (§ 2981.9; see *Nelson*, *supra*, 186 Cal.App.4th at p. 1004.) The purpose of the single document rule is to facilitate the consumer's review of the parties' agreement by forbidding the potentially confusing practice of making disclosures by reference to information contained only in documents other than the contract itself. (See 92 Ops.Cal.Atty.Gen. 97, *6, 7 (2009) ["the purpose of the single document rule [is] the facilitation of the consumer's review of all of the parties' agreements before the consumer signs the sale or lease contract, so that the consumer has complete and accurate information."].) The single document rule is, at bottom, a technical rule about document format—a reading buttressed by the circumstance that it appears in a sentence dictating what font size may be used in the contract. (§ 2981.9 ["Every conditional sale contract subject to this chapter shall be in writing *and, if printed, shall be printed in type no smaller than 6-point*, and shall contain in a single document all of the agreements of the buyer and seller with respect to the total cost and the terms of payment for the motor vehicle, including any promissory notes or any other evidences of indebtedness." (Italics added.)].) It is questionable whether a formatting rule should have any applicability to alleged inaccuracies in the substance of the document.

*Nelson* holds that a backdated second contract for a vehicle, similar to those at issue in this case, violates the single document rule because such a document does not contain "'all of the agreements of the buyer and seller with respect to the total cost and

32

the terms of payment for the motor vehicle.'" (*Nelson*, *supra*, 186 Cal.App.4th at p. 1004.) The *Nelson* court observes that a reviewer presented with an original contract and a backdated second contract would not be able to tell, on the basis of the documents alone, which is the operative contract, the date the operative second contract was actually consummated, or whether the buyer had paid a finance charge with respect to a period of time prior to consummation. (*Ibid.*) It rejects the argument that the second contract contains all the required information, because the consummation date, which is "an essential fact in calculating an accurate APR," does not appear on the face of that contract, and the APR disclosed therein is inaccurate, so the "disclosure itself is meaningless and the informational purpose of the ASFA is not served." (*Ibid.*)

We are not persuaded, because *Nelson*'s reasoning is flawed in multiple respects. First, we have already rejected *Nelson*'s erroneous conclusions regarding "preconsummation" finance charges. Second, the purpose of the single document rule is to facilitate the *consumer's* review of the parties' agreements, not review by a third party. (See 92 Ops.Cal.Atty.Gen., *supra*, at pp. *6-7.) A buyer signing even a backdated contract may be presumed to know the date that they are signing it.[18] Third, there is no specific requirement in the ASFA that all information necessary to calculate the APR be disclosed to the buyer: section 2982—via the incorporation of Regulation Z in the first unlettered paragraph—requires only that the APR itself be disclosed. (See § 2982; 15

---

[18] To be sure, it does not necessarily follow that the buyer knows the import of the contract's signing date with respect to determination of the APR, under Regulation Z. (*See Nelson*, *supra*, 186 Cal.App.4th at p. 1004.) But a consumer who signs a non-backdated contract would not necessarily have any better understanding.

33

U.S.C. § 1638, subd. (a)(4); 12 C.F.R. § 226.18(e) (2014).)  Fourth, *Nelson*'s interpretation of the single document rule renders a portion of section 2983 superfluous, specifically, the reference to the disclosure requirements listed in subdivision (a) of section 2982.  (See § 2983, subd. (a) [violation of any provision of § 2982, subd. (a), renders contract unenforceable]; *People v. Isaac* (2014) 224 Cal.App.4th 143, 148 ["Statutory interpretations rendering "'any part of a statute superfluous are to be avoided.'" [Citation.]"].)  If a contract containing an inaccurate disclosure necessarily violated the single document rule, as *Nelson* suggests—in addition to whatever provision requires the disclosure in the first instance—any provisions regarding specific disclosure requirements included in section 2983 would have no significance, because the contract would be unenforceable anyway for violating the single document rule.

Moreover, *Nelson*'s interpretation of the single document rule stretches a rule that on its face deals with format of a contract into a rule governing the accuracy of the substance of the disclosures contained in the contract, while citing *no* authority in support of that expansive interpretation.  (See *Nelson*, *supra*, 186 Cal.App.4th at pp. 1004-1005.)  The only case cited in *Nelson*'s discussion of the single document rule is *Rucker I*.  (*Nelson*, *supra*, at p. 1004.)  But the portions of *Rucker I* cited therein consist of language cherry-picked from discussions of policy reasons underlying Regulation Z, and policy concerns raised by "the combination of spot delivery contracts and the industry practice of backdating documents to the original delivery date" and "yo-yo" sales schemes.  (*Rucker I*, *supra*, 228 F.Supp.2d at pp. 717-719.)  Nothing like the single document rule is discussed anywhere in *Rucker*.

In short, we conclude that section 2981.9 is not implicated by the potentially inaccurate disclosures of APR caused by Raceway's backdating of second or subsequent contracts. The single document rule governs the format of the contract, not its substance, and we reject *Nelson*'s interpretation to the contrary as unpersuasive.

Having decided that neither section 2981.9 nor subdivision (a) of section 2982 is violated by the inaccurate APR disclosures potentially at issue in this case, and therefore the contracts are not rendered unenforceable by section 2983, the question remains what remedy may be available to plaintiffs. It is not apparent that the ASFA provides any remedy at all. (*See Nelson*, *supra*, 186 Cal.App.4th at pp. 1001-1002 ["we cannot say that the failure to afford a remedy [for a violation of Regulation Z] resulted from a legislative oversight."].) The ASFA does not provide for statutory damages, and on its face provides for recovery of actual damages only for specific violations, not applicable here. (See, e.g., § 2983, subd. (b) [buyer entitled to actual damages sustained for violations of § 2982, subd. (a)(2) or (5)]; § 2983.1, subd. (e)].) In any case, the only evidence of purported actual damages submitted by plaintiffs consisted of evidence they paid "preconsummation interest." We concluded above that "preconsummation interest" is neither illegal nor improper under Regulation Z, so "preconsummation interest" does not constitute damages.[19]

---

[19] *Rucker I* states that, absent a showing that a plaintiff not only read the disclosures at issue, but also "would have negotiated further or shopped around for better credit terms had the APR been properly presented," and further would have *obtained* better credit terms, a plaintiff cannot recover actual damages for inaccurate APR disclosures under TILA. (*Rucker I*, *supra*, 228 F.Supp.2d at p. 720.) But we need not,

*[footnote continued on next page]*

Furthermore, plaintiffs (unlike the plaintiff in *Rucker*) asserted no claim under

TILA, so the statutory damages available under federal law for violations of the APR

disclosure requirement governed by Regulation Z are unavailable to plaintiffs here.  (See

*Rucker I*, *supra*, 228 F.Supp.2d at p. 720 [discussing 15 U.S.C. § 1640, providing

statutory damages for violation of APR disclosure requirement set at twice the amount of

the finance charge in connection with the transaction, bounded by a statutory minimum of

$100 and a statutory maximum of $1,000].)  Nevertheless, plaintiffs did bring claims

under other provisions of California law besides ASFA.  We therefore turn now to Class

One's CLRA and UCL claims.

### 3. CLRA Claims

The CLRA lists various proscribed "unfair methods of competition and unfair or

deceptive acts or practices."  (§ 1770, subd. (a).)  On appeal, plaintiffs argue, based on

*Nelson*, that Class One is entitled to judgment in its favor on its CLRA claims because

the backdated contracts at issue fall within the ambit of section 1770, subdivision (a)(14):

"Representing that a transaction confers or involves rights, remedies, or obligations

which it does not have or involve, or which are prohibited by law."[20]  (§ 1770, subd.

---

*[footnote continued from previous page]*

and do not decide here whether a similar standard should apply under the ASFA: absent a showing of damages, it is not necessary to determine whether those damages were proximately caused by the alleged violation.

[20]  The SAC makes reference to other provisions of section 1770, subdivision (a), besides subdivision (a)(14).  Nevertheless, plaintiffs have made no argument on appeal based on these other subdivisions.  As such, we need not, and do not, consider their applicability, because any claims based thereon are waived.  (See *Paulus v. Bob Lynch*

*[footnote continued on next page]*

36

(a)(14).)  We disagree, and affirm the trial court's judgment in Raceway's favor on Class One's CLRA claims.

In *Nelson*, the court concluded that a dealership violates section 1770, subdivision (a) by entering into backdated second contracts that disclose inaccurate APRs because, by doing so, the dealership represents that it has the "legal right to collect finance charges effective [the date of the original contract], an obligation prohibited by Regulation Z." (*Nelson*, *supra*, 186 Cal.App.4th at p. 1023.)  As noted above, however, we disagree with *Nelson*'s conclusion "preconsummation interest" constitutes an "obligation prohibited by Regulation Z."  (*Ibid.*)  Regulation Z governs how APR is to be calculated and disclosed to the consumer; it does not prohibit the parties from contracting for interest to be calculated from a date prior to the consummation of the contract.  As such, plaintiffs' assertion they "were obligated to pay a finance charge they were not obligated to pay" is incorrect.  Nor do the contracts at issue involve an obligation that is "prohibited by law." (See § 1770, subd. (a)(14).)  We therefore affirm the trial court's judgment in favor of Raceway with respect to Class One's claims under the CLRA, and need not consider what remedies might be available to plaintiffs under the CLRA.

### 4.  UCL Claims

The UCL "borrows" violations of other laws and treats them as "unlawful . . . business act[s] or practice[s]" that the UCL makes independently actionable.  (Bus. &

---

*[footnote continued from previous page]*

*Ford, Inc.* (2006) 139 Cal.App.4th 659, 685 [failure to raise an issue in opening brief and support it by argument or citation to authority waives the issue].)

Prof. Code § 17200; see *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 180.) "After the 2004 amendment of the UCL by Proposition 64, a private person has standing to sue only if he or she '"has suffered injury in fact and has lost money or property *as a result of* [such] unfair competition."' [Citation.]" (*Nelson*, *supra*, 186 Cal.App.4th at p. 1013.) "In the context of a class action, only the class representatives must meet Proposition 64's standing requirements of actual injury and causation. [Citation.]" (*Ibid.*)

Assuming that at least some members of Class One can show that their second or subsequent contracts with Raceway were refinancings, requiring new disclosures, and the disclosed APR fell outside the margin of error allowed by Regulation Z, then there would be little question Raceway committed an "unlawful . . . business act or practice" in the meaning of the UCL. (Bus. & Prof. Code § 17200.) Nevertheless, Class One's UCL claims falter on the requirement that they demonstrate standing, as required by Proposition 64. Plaintiffs, following *Nelson*, contend that they have standing to bring UCL claims, based on their payment of "preconsummation interest." (*See Nelson*, *supra*, 186 Cal.App.4th at p. 1014.) Again, however, we reject *Nelson*'s conclusion that "preconsummation interest" is illegal or prohibited, so such payments do not constitute an injury. Plaintiffs have not proposed any other theory whereby Class One suffered an injury in fact resulting from the backdated contracts at issue, let alone any theory of causation. We therefore affirm the trial court's judgment in favor of Raceway on Class One's UCL claims on the basis that plaintiffs have not demonstrated standing for their

UCL claims, and we need not consider what remedies might be available to plaintiffs under the UCL.

*5. Conclusion*

It is possible that Raceway violated the ASFA with respect to at least some members of Class One, namely, those whose second or subsequent contracts with Raceway constitute "refinancings" (as that term is defined in Regulation Z) and disclose APRs that are outside of the margin of error allowed by Regulation Z. If so, however, contra *Nelson*, that does not render the contracts unenforceable, because neither section 2981.9 nor subdivision (a) of section 2982 is implicated by such inaccurately disclosed APRs. The ASFA—unlike TILA—does not provide for statutory remedies, and plaintiffs' only theory of actual damages presented in the litigation relies on *Nelson*'s analysis of "preconsummation interest" that we have rejected. Plaintiffs' claims under the CLRA and the UCL, which might otherwise provide additional remedies besides those authorized by the ASFA, fail because plaintiffs have not demonstrated Raceway engaged in any of the acts proscribed by the CLRA, nor shown standing to bring a UCL claim. Thus, even if Class One (or some subsection thereof) is able to demonstrate a verdict in its favor on its ASFA claims is appropriate, only a symbolic judgment unaccompanied by any specific remedy would be available in these circumstances.

It is worth noting here, however, that further adjudication of the merits of Class One's ASFA claims is not necessarily an idle exercise, even if no substantial monetary or other remedy is available to plaintiffs. The trial court previously awarded attorney fees and costs in the amount of $1,503,084.50 to Raceway as the prevailing party under the

39

ASFA. (See § 2983.4 ["Reasonable attorney's fees and costs shall be awarded to the prevailing party in any action on a contract . . . subject to the provisions of this chapter . . . ."].) A judgment in favor of plaintiffs—even a symbolic judgment unaccompanied by an award of monetary damages or other remedy—would necessarily alter the trial court's "prevailing party" analysis.

## C. Smog Fee Claims

Among the items that the subdivision (a) of section 2982 requires to be disclosed are "[t]he fee charged by the seller for certifying that the motor vehicle complies with applicable pollution control requirements," and "[t]he amount of the state fee for issuance of a certificate of compliance, noncompliance, exemption, or waiver pursuant to any applicable pollution control statute." (§ 2982, subds. (a)(1)(C) & (a)(4).) The members of Class Two were charged such fees as a result of a computer error, even though, as purchasers of used diesel vehicles, no smog check was performed by Raceway on their vehicles, nor was any state fee for smog certification necessary.[21] Plaintiffs contend that

---

[21] Since January 1, 2010, diesel vehicles meeting certain requirements have been required to undergo smog inspections and obtain smog certification similar to those required of gasoline vehicles. (Health & Safety Code § 44011, subd. (a)(8), added by Stats. 2007, ch. 739, § 3, operative Jan. 1, 2010.) During the time period at issue in this case, however, such requirements were imposed only on gasoline vehicles, and Raceway agrees the smog-related fees should not have been charged.

Plaintiffs suggest the cynical view that the "computer error" could have been "just a scheme to see how many illegal charges can be slipped into deals before someone catches on," but the trial court made the factual finding that there was no such scheme, only a "bona fide error." We have no cause to disturb that finding.

40

the erroneous charges resulted in Raceway violating subdivision (a) of section 2982.**22**

The trial court entered judgment in favor of Raceway, apparently agreeing that the ASFA had been violated, but concluding that Raceway had cured the violation: "Raceway is not legally required to do more to correct its erroneous collection of smog fees . . . . The court finds it to have been a bona fide error corrected with full refunds plus interest within a reasonable time under the Automobile Sales Finance Act." We agree with the trial court's result, but not its reasoning: We find no violation of the ASFA by Raceway with respect to Class Two.

The ASFA requires "full disclosure of all items of cost," including the items specifically enumerated in subdivision (a) of section 2982. (*Thompson*, *supra*, 130 Cal.App.4th at p. 966; § 2982, subd. (a).) Plaintiffs argue that Raceway violated this requirement by failing to "accurately disclose the amount due from the class members" with respect to smog fees. This is not quite true, however, if by "amount due" is meant "the amount due pursuant to the transaction agreed to by the parties." There are no hidden, undisclosed costs in the contracts entered into by the members of Class Two; the amounts charged for smog-related fees were accurately and explicitly stated in writing,

---

**22** Plaintiffs further argue in their reply brief that Raceway also violated the single document rule codified in section 2981.9 by charging the smog-related fees to the members of Class Two. This argument was waived, however, by plaintiffs' failure to raise it in their opening brief. (*Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 784-785 ["When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as waived."].) In any case, the argument is without merit, for the same reasons as discussed above in relation to application of the single document rule to backdated contracts disclosing an inaccurately calculated APR.

41

and the terms of the deal, including the smog fees, were accepted by the customers when they signed their contracts. The only purported "inaccuracy" is that, the parties agree, if they had more closely considered the provisions regarding smog-related fees at the time of the transaction, the contract they agreed to enter into would have been different. The question we must answer is whether section 2982 governs this sort of circumstance.

We conclude it does not. Like the single document rule, discussed above, section 2982 governs the "formalities" of contracts, not their substance. (See § 2982 [entitled "Formalities of conditional sale contracts"].) Subdivsion (a) of section 2982 requires a comprehensive "itemization of the amount financed," with specific disclosures that must be made in the contract. (§ 2982, subd. (a).) If the disclosures are made, and are true in the sense of accurately describing the terms of the parties' agreement, then the contract comports with the requirements for the "formalities" of conditional sale contracts.

The authority cited by plaintiffs does not require the conclusion that Raceway violated the ASFA because of the charges accurately described, but erroneously included in the contracts between Raceway and the members of Class Two. Authority addressing contracts that do not accurately describe the parties' agreement is not on point here. In *Nelson*, for example, the improperly calculated APR figure disclosed in the contracts at issue provided false information about the transaction—specifically, the cost of credit expressed as a yearly rate—to the consumer.[23] (*Nelson*, *supra*, 186 Cal.App.4th at p.

---

[23] As discussed above with respect to Class One, we agree with *Nelson* that disclosure of an inaccurate APR violates section 2982, though we disagree about

*[footnote continued on next page]*

1005.)  In *Bratta v. Caruso Car Co.* (1958) 166 Cal.App.2d 661, the contract at issue recited that the consumer had paid a cash down payment, but in fact only a promissory note for the amount of the down payment had been executed.  (*Id.* at pp. 664-665.)  Most egregiously, the disclosures in *Thompson*, incorporating "phantom" numbers designed to mislead potential lenders, among others, did not come close to describing the true transaction between dealer and buyer.  (*Thompson*, *supra*, 130 Cal.App.4th at p. 961.)  In contrast, the contracts between Raceway and the members of Class Two accurately disclose the economics of the transaction agreed to by the parties in all respects.

To be sure, a primary goal of the ASFA's disclosure provisions is to "protect purchasers against excessive charges . . . ."  (*Kunert v. Mission Financial Services Corp.* (2003) 110 Cal.App.4th 242, 248 (*Kunert*).)  The ASFA attempts to achieve that goal in a specific manner, namely, "by requiring full disclosure of all items of cost."  (*Kunert*, *supra*, at p. 248.)  Here, despite full disclosure of all items of cost, the members of Class Two were charged fees that the parties now agree should not have been charged, so the goal of protecting purchasers from excessive charges was not initially achieved.  It does not follow, however, that the "informational purpose of the ASFA [was] not served."  (*Nelson*, *supra*, 186 Cal.App.4th at p. 1005.)  We disagree that a contract can disclose accurately every dollar that is part of a transaction agreed to by the parties, and nevertheless constitute a violation of ASFA disclosure provisions.  The members of Class

---

*[footnote continued from previous page]*

precisely which part of the statute is implicated, and therefore what remedy is available for the violation.

Two received all the information that the ASFA required them to receive; among other things, they were informed, in writing, how much they were being charged for smog-related fees. They just did not act on that information by verifying that all of the listed charges were appropriate prior to signing.[24]

Our conclusion—that section 2982, subdivision (a) is not violated in the circumstances of this case, so the trial court's judgment in Raceway's favor with respect to the claims of Class Two should be affirmed—does not leave other vehicle buyers who are charged inappropriate fees by dealerships without redress. It seems likely that one or another provision of California statutory or common law would provide such consumers a remedy—albeit perhaps not the rescission and restitution sought by plaintiffs under the ASFA—especially if, unlike Raceway, the dealership at issue was not forthcoming with payment of refunds, or had charged inappropriate fees with fraudulent intent. Class Two, however, asserts *only* a claim under the ASFA: plaintiffs did not appeal the trial court's denial of class certification for Class Two's UCL claims, and did not assert any claims under other legal or equitable theories. We need not consider here, therefore, what other claims might have been brought on these, or similar, facts. In addition, because we conclude plaintiffs failed to demonstrate any violation of the ASFA with respect to Class

_____

[24] This is not to say that blame for the improper charges should be placed on the consumer. Of course, Raceway erred by charging inappropriate fees, and that error is ultimately Raceway's responsibility. Nevertheless, both Raceway and the members of Class Two missed an opportunity to catch the errors in the first instance, by carefully reviewing all items of cost listed in the contract prior to signing. And the question of whether Raceway was in the wrong for charging the fees is a separate question from whether the ASFA's disclosure provisions were violated.

Two, we need not consider the parties' arguments with respect to whether Raceway successfully cured any violation.

## D. Credit Application Claims

It is undisputed that Raceway had a policy of providing each customer a copy of any credit application made during the course of negotiations, as required by the ASFA. (See § 2981.9.) Certain individual plaintiffs, however, assert that this policy was not implemented in their case—that they did not receive copies of their credit applications from Raceway. The trial court ruled in favor of Raceway on the issue. On appeal, plaintiffs contend that Raceway's evidence of a policy or practice is insufficient as a matter of law to overcome the "transaction-specific testimony" of the individual plaintiffs who testified that they did not receive copies of their credit applications. They additionally contend—somewhat half-heartedly—that the trial court's decision was "based on an incorrect legal basis." We disagree with both of these contentions.

The ASFA requires that, prior to delivery of a vehicle to a buyer pursuant to a contract subject to that chapter, the seller must provide the buyer certain documents, including a copy of "any credit statement which the seller has required or requested the buyer to sign and which he or she has signed during the contract negotiations." (§ 2981.9.) The trial court ruled that plaintiffs "failed to meet their burden of proof" with respect to their claim that Raceway had violated this provision of the ASFA, explaining that "no credit applications were needed or required with the second contract, and there was competent but conflicting evidence presented on both sides of the issue as to whether copies were provided with the first contract."

45

Plaintiffs' argument regarding the "legal standard" applied by the trial court is quickly dispatched. Plaintiffs assert that "[t]o the extent the trial court based its decision on whether a credit application was required solely for the second contract, the decision was based on an erroneous legal standard." This argument, however, only knocks down a straw man: the trial court applied no such standard. The trial court made the (undisputed) factual finding that consumers who entered into second or subsequent contracts with Raceway were not required to submit new credit applications, so there could have been no violation of section 2981.9 with respect to those contracts.[25]

The trial court further found plaintiffs failed to establish any violation of section 2981.9 with respect to plaintiffs' initial contracts with Raceway. As noted, Raceway presented testimony establishing it had a policy and practice to provide each customer a copy of any credit application. Such testimony is circumstantial evidence supporting the conclusion that, in any given instance, the customer did in fact receive a copy. (See *Hasson v. Ford Motor Co.* (1977) 19 Cal.3d 530, 548 (*Hasson*) ["the fact that evidence is 'circumstantial' does not mean that it cannot be 'substantial'"].) The trial court acknowledged that plaintiffs submitted competent evidence to the contrary, but found plaintiffs did not prove their case by a preponderance of the evidence.

Plaintiffs contend the "transaction-specific" testimony of individual plaintiffs that the policy was not followed in their particular cases should have been given controlling

---

[25] To the extent the trial court's language in its Statement of Decision may be viewed as ambiguous, we here resolve that ambiguity in favor of affirmance. (*City of Santa Maria*, *supra*, 211 Cal.App.4th at 286.)

weight.  We disagree.  It is hornbook law that a trier of fact is "entitled to accept persuasive circumstantial evidence even where contradicted by direct testimony. [Citations.]"  (*Hasson, supra*, 19 Cal.3d at p. 548; see also CACI No. 202 ["As far as the law is concerned, it makes no difference whether evidence is direct or indirect.  You may choose to believe or disbelieve either kind."].)  The trial court was entitled as the trier of fact in this case to give whatever weight it chose to plaintiffs' "transaction-specific" testimony—including none at all—and we will not reweigh the evidence here.  (See *Cuiellette*, *supra*, 194 Cal.App.4th at p. 765.)  Plaintiffs' evidence does not compel a conclusion in their favor as a matter of law, so the trial court's finding that they did not meet their burden of proof with regard to the alleged violations of section 2981.9 will be affirmed.  (See *Sonic*, *supra*, 196 Cal.App.4th at pp. 465-466.)

**E.  Individual Claims of Francisco Salcedo**

As noted, the trial court found Raceway liable for common law fraud with respect to Mr. Salcedo, because it misrepresented that he "could not refuse to sign a second contract and unwind the transaction," when Raceway was unable to assign his initial contract for purchase of a vehicle.  Mr. Salcedo also asserted individual claims under the UCL and CLRA, based on the same fraudulent misrepresentations by Raceway.  The trial court never explicitly ruled on Mr. Salcedo's UCL and CLRA claims, although the parties and the court apparently understood the court's judgment on those claims to be in favor of Raceway.  Plaintiffs contend that, as a matter of law, the same facts that established judgment should be entered in Mr. Salcedo's favor on his common law fraud

47

claim also establish a violation of the UCL and CLRA, so he is entitled to judgment in his favor on those claims, as well. We agree.

Both the UCL and the CRLA provide remedies in addition to other remedies or procedures under California Law. (See Bus. & Prof. Code, § 17205 [UCL is "cumulative . . . to the remedies or penalties available under all other laws of this state"]; Civ. Code, § 1752 [CRLA remedies "are not exclusive," but rather "in addition to any other procedures or remedies for any violation or conduct provided for in any other law"].) It is uncontroversial that a business practice that meets the standard for liability for common law fraud would also suffice to establish liability under the "unlawful" or "fraudulent" prongs of the UCL (even if the converse may not be true). (See *Committee on Children's Television, Inc. v. General Foods Corp.* (1983) 35 Cal.3d 197, 211 [allegations of actual deception, reasonable reliance, and damage are unnecessary for UCL claim]; *id.* at pp. 209-210 [Bus. & Prof. Code, § 17200 "is not restricted to deceptive or fraudulent conduct but extends to any *unlawful* business practice"].) Similarly, Raceway's false representation to Mr. Salcedo that he was obligated to purchase an alternative vehicle, and could not unwind the transaction, violates the CRLA's prohibition on "[r]epresenting that a transaction . . . involves . . . obligations which it does not have or involve, or which are prohibited by law." (Civ. Code, § 1770, subd. (a)(14).

Indeed, though Raceway never explicitly concedes the point, neither does it offer any argument why the elements of Mr. Salcedo's individual UCL and CLRA claims might not have been established, even though he did prove common law fraud. Instead,

48

Raceway's response is, in essence, that Mr. Salcedo is not entitled to any further remedies, since he was already granted rescission. The issue of remedies, however, is a separate question from whether Mr. Salcedo is entitled to judgment in his favor.

Nevertheless, it is not implausible that Mr. Salcedo should *not* be awarded any additional remedies. He already has been awarded damages in the form of rescission and restitution, and the trial court has already determined that he is not entitled to punitive damages. The UCL provides only injunctive, restitutionary and related relief. (Bus. & Prof. Code, § 17203.) The CRLA provides for a broader range of remedies, but prior to trial plaintiffs stipulated that they brought their CRLA claims "*for injunctive relief only.*" (Original italics.) Moreover, it seems unlikely that injunctive relief would be appropriate, given that the record is devoid of any evidence of similar misrepresentations to other customers, or any other indication that the misrepresentations to Mr. Salcedo were anything other than a one-time event.

In any case, the issue of remedies is one that should be decided by the trial court in the first instance. Here, it is not apparent from the record that the trial court ever considered whether Mr. Salcedo might be entitled to any additional remedies, based on his individual UCL and CLRA claims, over and above those awarded for his common law fraud claim. On remand, the trial court should enter judgment in Mr. Salcedo's favor on his individual UCL and CLRA claims, and determine—explicitly, and on the record— what remedy, if any, Mr. Salcedo should be awarded with respect to those claims. Mr. Salcedo also should be treated as the prevailing party not only with respect to his fraud

claim, but also his individual UCL and CLRA claims, for purposes of determining any award of attorney fees and costs.

## F. Fee Order

Our ruling here with respect to plaintiffs' appeal of the judgment below undermines the basis for the trial court's award of fees to Raceway, namely, the proposition that Raceway prevailed on all claims asserted by plaintiffs except for Mr. Salcedo's fraud claim. As such, we need not address the merits of the arguments raised by the parties in plaintiffs' appeal and Raceway's cross-appeal of the fee order: the fee order must be vacated, and the issue of attorney fees and costs remanded for reconsideration following final adjudication of all claims.

## V. DISPOSITION

In case No. E054517, the judgment below is affirmed in part and reversed in part as follows:

- With respect to Class One's cause of action for violation of the ASFA, the judgment is reversed, and the matter remanded to the trial court for any further proceedings necessary to determine whether the members of Class One, or some subsection thereof, can establish a violation of the ASFA under the law as explicated in this opinion.

- With respect to Class One's UCL and CLRA causes of action, the judgment is affirmed.

- With respect to Class Two's claims under the ASFA, the judgment is affirmed.

50

- With respect to the claims of plaintiffs Carl Stone, Deborah Stone, Francisco Salcedo, Anselmo Alaniz, Joe Contreras, Edelmira Contreras, Jonathan Ott, Martha Ott, Eldridge Johnson, Randal Kidd, Macon Pollard, Ozetta Pollard, and Suzanna Moreno under the ASFA in their individual capacities regarding their credit applications, the judgment is affirmed.

- With respect to the causes of action asserted by plaintiff Francisco Salcedo under the UCL and the CLRA in his individual capacity, the judgment is reversed; the trial court is directed to enter judgment in favor of Mr. Salcedo on those causes of action, and to determine what additional remedies, if any, other than those he has already been awarded with respect to his cause of action for common law fraud, he should receive.

- The judgment is affirmed in all other respects.

In case No. E056595, the trial court's fee order is vacated, and the matter of an award of attorney fees and costs remanded for determination by the trial court, after final adjudication of all claims.

The parties shall each bear their own costs on appeal.

CERTIFIED FOR PUBLICATION

HOLLENHORST
J.

We concur:

RAMIREZ
P.J.

RICHLI
J.

51